Good morning. You'll notice that Justice Patrzynski could not join us this morning. She has told us the questions she has, she's reviewed everything, and she will listen to the tape. These microphones are not amplifiers, they're recording, for recording, and she will listen to the tape. So, with that, I'd appreciate it if counsel who will be arguing, please step forward and identify yourself and about how long you intend to argue. I'm David Jasper for the Plaintiff Appellate Court. How long? I can argue for as long as I like, what's reasonable. Well, you tell me. I don't know how long you're trying to argue. We are 20 minutes or so. 15, usually 15 and 5 or whatever you want, something like that. We have a little time for rebuttal. Rebuttal. Okay. Good morning, Your Honor. There's a hearing to be declared for the appellees, and depending on where counsel takes us and where the court takes us, I would expect to argue by 15 minutes. Okay. Thank you very much. Thank you. Let me proceed. Thank you. Thank you. Good morning. In this case, we ask the court to correct a serious injustice in the grant plaintiff, the JNOV, or at the very least a new trial. I think in this case it's remarkable that all of the doctors in the case, both on the plaintiff's side and the defense side, including the defendant doctor himself and his experts, agreed with the standard of care set forth in the plaintiff's basic principles 1 through 12. So the standard of care was not the issue in the case. It was really, you know, did this doctor breach the standard of care? And specifically, it revolved around the primary issue as far as did the doctor ask about this patient's pain at the time of onset? So that's the issue that really is the core of the plaintiff's claim here. You argued that issue to the jury. There was conflicting evidence on it. Wasn't it for the jury to resolve? No. As a matter of fact, no. There was no conflicting evidence on it. What the co-workers testified to was uncontradicted, unimpeached, unrebutted. The co-workers weren't at the hospital. Correct. What the evidence focused on was what the EMT notes showed, what the triage notes showed, what Dr. Almeida's notes showed. And so nobody was out interviewing Mr. Hamilton's co-workers. Well, with all respect, or maybe that's a bad phrase, but in my view, let me say that, that the evidence focused very heavily on the testimony of the co-workers. And we never alleged in this case that Dr. Almeida needed to interview the co-workers, he needed to interview the patient. And had he asked this patient, he testified the patient answered intelligently, answered him completely, answered him thoroughly, did everything he could to bring the information to bear. The record shows that, I think on cross-examination, he said, I asked him about the pain at onset. And he said, yes, I did. Did you ask him about cardiac pain? Yes, I did. Yes, by the time we got to the second trial and they'd figured out our case, he'd changed his testimony numerous times. His original testimony. Let's say the testimony at the second trial was different than the first. You took every opportunity to impeach Dr. Almeida with his prior testimony, and the jury had to decide what they believed, right? No, no, they didn't. They're not entitled to base their verdict on evidence that is speculative and conjecture. And that's what this was. This is just making stuff up out of thin air. I would cite the Reardon case, which we relied heavily on in our brief, and that was a med-mal case, verdict for the defendant, and the court overturned it because of the overwhelming evidence in favor of the plaintiff, just like this court, this case. And the court said, the defense correctly asserts that assessing the weight and credibility of testimony is exclusively in the province of the jury. When conflicting testimony exists, it's for the jury to resolve the conflict. However, the jury cannot accept expert testimony arbitrarily. The jury must consider the facts and the evidence upon which the experts base their opinions. Now, in this case, you had unrebutted testimony from the co-workers as to what happened on the loading dock. The paramedics don't get there until later. They're not there when Michael's pacing around and stabbing his chest and sweating profusely. The paramedics don't come until 33 minutes later. This starts at 145. The paramedics don't get there until 218. And they further testify. They ask about real-time only. They never asked about what went on before. Every medical witness in this case testified. We're talking about the doctor here, not the paramedic. Okay. Well, the doctor originally said that he asked about real-time only. That's why he testified to it as a deposition with which he was impeached. He testified to that in the direct examination in the first trial. His own experts admitted that it's real-time only. In the first trial, you had an opportunity to bring anything up you wanted in the second trial. So, again, the jury had an opportunity to hear your cross-examination and hear your position, and they didn't agree with it. Well, again, you can't just make stuff up as a witness. Who's making stuff up? That's what I – Dr. Elmita is making – Well, that's your position. The jury didn't find that. And, again, you cross-examined the doctor on that point. The jury is not entitled to base their evidence on that testimony when a doctor's testimony is simply based on pure conjecture. He testified. Didn't remember Michael. Didn't remember his treatment of Michael. He was testifying on what he would have done. What you're saying is you were entitled to summary judgment on liability, right? Absolutely. Okay. Did you move for it? We moved for a directed verdict. Yes, we did. No, no. Did you ask for summary judgment prior to trial on the issue of liability? We did not ask for summary judgment, no, nor would it have been granted by this judge. But we moved for a directed verdict after the evidence. You submitted an issue to the jury. The jury – the instructions say, here's how we claim the defendants were negligent. You had half a dozen bases upon which you claimed the defendants were negligent. And you tell the jury, you are the finders of fact. It's for you to decide whether the plaintiff has proved the incidence of negligence alleged, right? Correct, but the jury cannot sit there and base their verdict on testimony that is obviously conjecture and surmise and speculation. So a doctor can't just go there and make stuff up. We cited several cases on that. We have the Casey case. We have May v. Columbia Rope Company. There's another one where the plaintiff – in this case, it was the plaintiff who was making stuff up. They claimed that the rope was brand new. It had been used only for 45 minutes. You could see clearly from the evidence that it wasn't brand new. And the court said that this is strange credulity to find that. And in that case, they said they must examine the reasonableness of the testimony offered. We have presented a mountain of evidence. I mean, there's overwhelming evidence that's one-sided, except for this doctor's naked, unsupported, bald assertion that he claims now 10 years later for a patient he can't remember that, yes, he did ask these questions with no corroborating evidence whatsoever from any other witness or any medical record. There's not a thing in the medical records about that. Refer to pain at 2.30 in the afternoon. I'm sorry? Notes refer to pain at 2.30 in the afternoon. They do, and that's the extent of it, Your Honor. But what the evidence is in this case is that he was required to ask about the severity of the pain at the time of onset, the location of the pain at the time of onset, the character of the pain and the associated symptoms at the time of onset. And there's not a thing in this record that this doctor asked about those questions other than his naked assertion that he did so 10 years later based on nothing. So it's completely unsupported. All his own experts agreed that it's all real-time only, everything in this case. Furthermore, if you take the doctor at his word, it's absolutely unbelievable. Because why? Because we know that the dissection had to occur before this patient came to the ER and on the loading dock, exactly like the co-workers said in their unrebutted, uncontradicted testimony. And that's what you argued to the jury. That's what you argued to the jury. We did argue to the jury. But again, the case law is clear that when the evidence is that strong, you cannot as a jury base your verdict on evidence that's pure conjecture. I don't see you keep talking about how strong. But the experts said that this situation, he should have been dead within 48 hours, as I recall. No. That it would not have occurred days later if the terror was the type that they were talking about. No. There was testimony of that. No, no, no. In fact, the evidence is that the mortality rate is a certain percentage for each day, about 24% a day. But many patients survive a week, two weeks out, and even forever. In this case, not everybody agrees. Not all experts say the same thing, okay? So just because there's some disagreement among the experts doesn't mean that you're right. As long as the expert's testimony is not based on conjecture and surmise. In this case, you're referring to Dr. Job. And he changed, again, changed his testimony from the first trial. But what he says is it's not clear to him. It's a very difficult decision at the very least. And he said clearly that you have to have severe pain. This is pain that you don't miss. It has to be accompanied by severe pain. There's not one shred of evidence of any severe pain that this patient had when he was closely watched and monitored by his family members and friends after he went to the ER. There's only one and only one instance of that, and that's on the loading dock as witnessed by the co-workers who were not his friends, who had no stake in this case, and who testified truthfully as to what happened on that loading dock. That's the only time that this dissection could have occurred. So the expert could talk from here to eternity about that. And there are experts. I'm recalling this argument from your closing argument. This is the closing argument you gave to the jury. It doesn't mean that the jury gets to reject evidence. That is overwhelming. It's 100%. It has to be a plaintiff's verdict. In this case, on this record, with these facts, absolutely. It would be ironic for this defendant to argue how sacrosanct a jury's verdict is in any case, knowing what happened with the first trial. But in this case, they cannot base their decision upon Dr. Cishon's testimony that the dissection occurred after the ER visit based on some fabricated make-believe stuff that he's making up. So to say that there's more pain, that someone testified in a deposition somewhere that he can't identify, that there was more pain on fire, didn't happen. It's not true. There's nothing on the record about that. No one testified to that. It's not the case. And that's the basis for his causation testimony. Now we have to get into the 501, which really mandates that this verdict be overturned. I mean, no question on that, in my mind. So Dr. Cishon, they were allowed to substitute Dr. Cishon for Dr. Mulliken. There was no reasonable excuse to do that. It changed the entire course of this trial. It allowed them to talk about this nonsense about that the dissection occurred after the ER, which is completely contrary to the case in the first case. Furthermore, the remedy, quote, unquote, that this court offered was completely inadequate and inappropriate under the law, cursey and all the other cases that we've cited. In fact, we weren't even entitled. This judge said you cannot suggest that there's an inference, an adverse inference in this case, and I don't want you talking about that or suggesting that. So we weren't even allowed to do that. So we had no remedy in this case. The court invited you to introduce the other doctor's testimony as an evidence deposition. It didn't do it. What the court did is say that you can talk about that there's another doctor and that he had opinions that are different. He said, and this is in the March 16th transcript that's in the record, you can see that he said you are not permitted, counsel, to talk about that there's an adverse inference in this case or that there's a missing witness in this case. And that's the whole point of what we're missing with this instruction. We weren't entitled. We don't have the imprimatur of the court to say that they failed to call this witness because they knew that the witness's testimony was unfavorable. It was directly contrary, certainly not cumulative. It was diametrically opposed in the causation testimony to this new doctor that they were allowed to call. True or not that the court said that you could convert Dr. Bullikin's testimony from the first trial into an evidence deposition and read it at the second trial? True or not? It may be true. True or not? Maybe. Was it true or not? It's true, isn't it? It's true. Okay. It's true. And you didn't do it? We did not. Okay. There would have been no remedy. Well, we don't know that. This is their witness. It's their retained expert. The cases are clear in every instance, even when you have an IME, that this is a retained expert that's retained by a party. He's an adverse party to us. We couldn't call him. The judge gave you permission. If you thought it was so important to have this witness's testimony, you could have had it. You decided you didn't. No. No. It's entirely different to call him as a witness in our case. It changes the entire thing. Now we're vouching for this witness. No, no, no. That's not what 501 is all about. You said the court wouldn't have instructed that this was an expert on the other side? No. Absolutely. When you call the witness in your case and now you're vouching for that witness. Isn't that true? That's not the way the courts work. You can always call an adverse witness, and the jury knows it's adverse because you tell them. I disagree. Then we're taking on this witness, this expert's testimony. You can't call an adverse witness. As if it's our own. I mean, when you call a witness, it's always you can't call an adverse witness and the people know, the jury know that it's adverse. It's not our burden to call this witness, and it's not a burden that we should have to take on, and it's not a remedy when they think it's their witness. They never abandoned this witness. They never withdrew this witness. Their witness, okay? And they are obligated to call that witness. They failed to do so. There is a remedy for it. It's called the IPI 5.01, and that's the only remedy that would be adequate in this case because it's the only thing that can tell the jury that these guys are really hiding something, as we all know. They're hiding this doctor's testimony that was so disfavorable to them in the first case, and that's a big reason why they lost the first case, and that's why they wanted to get rid of this guy. We all know that. And without having the force of law behind us to give this jury instruction that that's what was going on here, that changed the entire course of this trial and led to the wrong verdict. So that's a completely inadequate remedy in my view, and I think it's inadequate under the case law that is extremely clear. Another thing that I asked the court to look at is there's an issue as to we had asked the court to allow us to read Dr. Almeida's testimony from the first trial in its entirety. We properly submitted that to the court. I think the case law, again, is clear that when you have a party opponent that that is an admission. We've properly submitted that to the court, and we've properly submitted that to this court, that we'd be allowed to read his testimony in its entirety from the first trial. We were not allowed to do that. That was a wrong decision. Again, that also changed the course of this trial. You then have the speculative testimony, you know, of Dr. Shishon about the differential diagnosis. He claimed that Dr. Almeida put Eric's section into his differential diagnosis when, in fact- Could I just stop you for a second, Mr. Jasmer? Where in your brief is the argument about reading Dr. Almeida's testimony in its entirety? Here's page 27, last paragraph. What I'd asked the court, and that's what I've appealed in this case, plaintiff should have been permitted to use Dr. Almeida's testimony from the first trial as substantive evidence in her case in chief. The court's refusal to allow plaintiff to do so was error. So I think that's a very, very important point. We've made our points in our briefs about the improper closing arguments that were really allowed to happen in this case because the court made the error of allowing Dr. Shishon to testify so that they could come up with this theory that the dissection supposedly didn't occur in the face of all the evidence, really one-sided evidence to the contrary, that the dissection supposedly didn't occur until after the ER visit. And then as far as Dr. Shishon, this is a guy who, you know, again, it's not just the one thing he's making up about the more pain on Friday. He also made up, oh, Dr. Almeida did put Eric's section in his differential diagnosis when Dr. Almeida testified exactly to the contrary in this case. And sorry, I forgot where I was going on that. That's okay. Just that even if we take Dr. Shishon or taking Dr. Shishon at his word that Dr. Almeida did include the Eric dissection in his differential, that's another one of the basic principles. That's what I was going to say, that if you have Eric dissection in your differential diagnosis, even if it's a very low probability, you have to do a CT because it's so deadly. So even if Dr. Almeida did include Eric dissection in his diagnosis, they failed for that reason. Now, the defense in this case, they never addressed any of our arguments on any of the other issues instructions. Just the one issues instruction that we've been talking about, which is did the doctor ask about the time of onset. We had several other theories in this case. And that evidence is, again, one-sided, overwhelming, unrebutted, uncontradicted. They didn't even address it in their brief. So we have the fact that he never retook his vitals, never asked about his pain upon discharge. We have the fact that when you have acute, severe abdominal pain, just going off abdominal pain, which is what this doctor got from this patient, we know it was acute. None of those things are in question. The only question is was it severe. But if it's severe, everybody agreed, including the defendant doctor and their experts, that you need to include aortic dissection in your differential diagnosis. Now, their own expert, Joe, agreed that the pain was severe when you read the EMS report. Their own floor nurse, Nurse Scheidt, agreed that the pain was severe. And all of the evidence in this case shows that the pain was severe when you have a 35-year-old man taken from his place of work in the middle and in front of all of his co-workers during the middle of the day and rushed him to the hospital. So it's obvious that we win just on that basis again. Then you've got the failure to include aortic dissection in your differential diagnosis, which Dr. Shoshone testified to. So we win on each one of those things in addition to all of the other things. And that's never been countered by the defense in this case. Thank you. So we ask for a J&OV, at the very least, for a new trial. Thank you. Ms. DeGrande. Good morning, Your Honors. Karen DeGrande for the defendants' appellees, Dr. Jose Almeida and XL Emergency Care. May it please the Court, Counsel. Let me take a very different view of this case, and I think that's probably an understatement. There are several comments that I feel ought to be responded to about the basis for a new trial, which is not before the Court, but I think the record needs to be corrected in that regard. Judge Elrod granted the new trial for one reason and one reason only, because it was his belief that he saw the most gross misconduct during closing argument. This is not in the record, right? It is in the record, Your Honor, because the transcripts. But I just wanted to correct that statement, because the statement that there was a- It's irrelevant for our purposes. Okay. Well, I agree, but since we had so many comments about that, and, of course, that order was never appealed by the plaintiff. Let me, before I answer some of these more big picture issues, I wanted to answer the Court's question about the issue of the plaintiff raising the matter of being allowed to read Dr. Almeida's trial transcript or trial testimony. That issue was waived by virtue of the very limited mention of it in the brief, but also at the trial, and this appears at Volume 19 at page 234. Mr. Jasmer's co-counsel, Mr. Wright, actually conceded that the plaintiffs were not permitted to read Dr. Almeida's testimony. And, of course, and we set this out in detail on page 31 of our brief, there was no offer of proof. There was no specific tender of any portion of Dr. Almeida's testimony. And, of course, it would have been inappropriate, as Judge Elrod ruled, to start reading any of it when Dr. Almeida was sitting there. And I'll also emphasize to the Court that this doctor was submitted to two days of examination by plaintiff's counsel, first by Mr. Wright and then on recross examination in adverse by Mr. Jasmer. So the Court is absolutely correct when it concludes that the plaintiff had every opportunity to raise whatever inconsistency it saw, any issue it saw, and Dr. Almeida answered all of those questions to the very best of his ability and I think was very forthcoming before the jury. I would say, just stepping back a moment, this is not a case where, and as both of your honors had commented on this, where anything was left out from the jury. There's not one argument here that there was an argument that Judge Elrod precluded the plaintiffs from making. Every bit of these challenges and the whatever inconsistencies the plaintiff assists were there or the problems with one person's testimony versus another, that all went in. Judge Elrod, in his own words, and this is in the record of the argument on the post-trial motion, bent over backwards to allow plaintiffs to make their case. And I think the record really and truly bears that out. On what appears to be the plaintiff's primary argument, which is this business of the co-worker's testimony being unrebutted, it seems to me fairly clear that the Court appreciates the defense argument that is, this testimony by no means was unrebutted. And I think there's possibly a little bit of an issue as far as the plaintiff reporting to the Court that the paramedics did not, were not at the scene until some long period of time after Mr. Hamilton came down with these symptoms. In fact, the record shows that the paramedics were called while Ms. Gouveia, during the time that Ms. Gouveia reported that Mr. Hamilton was in extreme distress and the record also bears out that the paramedics were there within minutes. And so what would have to occur, of course, for this Court to overturn this verdict based on the testimony of the folks at the loading dock would be to say that no physician or other health care provider could defend himself or herself unless he had a specific recollection of all of the events. And obviously that's not the case in the law, that's not the law of Illinois. No expert could ever testify unless the expert also personally witnessed all of these events. And that obviously is not the case every day in the courts. There is testimony that's based on medical records, and that is the law of Illinois. The Court would have to disregard all of the medical records to agree with this, and the jury just simply didn't agree. I'm going to a different issue. Sure. The doctor at the hospital or the nurses, no one asked, as I understand it, about what his symptoms were at work. Is that correct? I don't think that's a correct characterization, Your Honor. There's not a, I'm sorry. But where in the record, then, is there? Those specific words are not in the record. But that he was asked about what his condition was before he was brought in? Dr. Almeida testified that he did ask those questions, though. And that was brought out as part of the lengthy adverse examination. And the doctor reached that conclusion, because as he admitted, he didn't have a specific recollection of asking that specific question. But he reached that conclusion based on the notation that the pain was constant, that it began at 230. And from that, he was able to determine, and based on his own custom and practice, that he would have determined from, and he testified to this at great length, he would have determined from the patient himself, who I submit is a better reporter of how he was feeling and how he had been feeling than his coworkers. And that's clear based on the testimony of Dr. Almeida. Constant pain beginning at 230. And based on that, those notations, and based on the doctor's custom and practice, yes, he did obtain a history of the pain from the outset. So I don't think there's any, there can be any dispute that that testimony is in the record. Specific words exactly, but the clear import of the medical record. And then as far as there being a basis for reaching a conclusion that the court should disregard all of the expert testimony, because it was speculative and so forth, all of the other attacks on it, there was not one objection to the foundation for the testimony of these experts. So to the extent, now certainly there was plenty of cross-examination, but if the testimony was so unfounded, then it was incumbent upon the plaintiffs to make that motion and to make that challenge during, you know, before or at least during the course of the trial, and that was never done. There was very lengthy and unfettered cross-examination of all of those experts. But certainly no challenge to the foundation. I think that's a very important point. So for the plaintiff to say that as a matter of law, Dr. Johnson and Dr. Schuman, based on the testimony of the folks at the loading dock, must carry the day, I think simply is just not supported by the record or by any basis in Illinois law. Dr. Johnson was really almost more supportive of the defense, and that was our position at the trial, and that's why we emphasized Dr. Johnson's testimony so much at the trial, and Ms. Arrigo emphasized it in arguing to the jury in her closing argument. And that's one of the reasons that the argument that we take issue and disagree with the argument of the plaintiff about the Mullikin v. Sechon issue. First of all, this was not a substitution of experts. Dr. Mullikin and Dr. Sechon both were emergency room physicians who were disclosed in September of 2010 as experts for the defense. So this was not a matter of a switch right before trial. It was a matter of Dr. Mullikin, who had testified at the first trial, before the second trial, with a month to go, plenty of time, plenty of notice, probably even more than what was required, frankly. The defense advised the plaintiff's counsel that Dr. Sechon would be the emergency room expert, and Judge Elrod made very clear that he was not going to permit two emergency room experts to testify. So the issue, as we see it, on the argument Mullikin v. Sechon, frankly, we think the plaintiff got much more than the plaintiff was entitled to. There's no question that there shouldn't have been a 501 instruction. As the plaintiff admitted and argued when this issue was brought before Judge Elrod, the witness wasn't missing. The entirety of his testimony was preserved, and as Justice Hyman pointed out, that Judge Elrod gave plaintiff the option to even read that in its entirety. What the plaintiff really wanted is something that is not allowed by Illinois law. He wanted to force the defense to say, we'll present Dr. Mullikin, we won't present Dr. Sechon, and there's just absolutely no legal basis for requiring that. So there's certainly no issue of a lack of availability, and there's no case that was cited by the plaintiff that exists as far as I know that would support that conclusion. As far as it being cumulative, the plaintiff in his own moving papers on this issue said that the testimony would be cumulative. At one point he said it wouldn't be cumulative, at one point he said it would be cumulative. But it either would be or wouldn't be, regardless of what the ruling could be, and it certainly I don't think ever could be that it would merit a 501 instruction based on the defendant's election not to call Dr. Mullikin. That would not affect Dr. Sechon. He was fully disclosed. There's no reason why that ruling would affect Dr. Sechon. And as far as Dr. Sechon's testimony having this dramatic impact, I don't think the record bears that out at all. One example is that the plaintiff cites of this impact is the closing argument of defense counsel. Defense counsel mentions Dr. Sechon during the closing only on the issue of the standard of care. She didn't even mention Dr. Sechon on the issue of causation. And clearly the testimony of Dr. Jobe, which was discussed during that closing argument, and the testimony of Dr. Silver, which set forth that there was no indication of an aortic dissection on the chest X-ray, which Dr. Silver and, of course, Dr. Johnson, plaintiff's own expert, both said would be present and usually is present in approximately 90% of cases, that wasn't shown. And that's why Dr. Johnson was almost a defense expert, because he was very forthcoming. And he said, even though it was his opinion that he testified to that the patient had aortic dissection in the emergency room, but in 90% of the cases you see a change on the X-ray. And in this case there was no such change. And that's why Dr. Johnson's testimony alone under Leonardi would meet the slight evidence standard to merit a 1205 instruction. So there's really, it's really not an accurate recitation of the record to argue that Dr. Sechon's testimony was the only testimony that supported a 1205 instruction. That's just not the case. And that certainly is borne out by Ms. Arrigo's closing argument, where Dr. Jobe and Dr. Johnson were emphasized. Now, I think it's also worth mentioning that as far as the testimony of the plaintiff's experts, it certainly could not carry the day, it did not carry the day as far as the jury was concerned, it certainly could not carry the day as far as a ruling as a matter of law. Especially when one considers that there were two crucial experts in this case in areas of radiology and cardiology. And guess what, they only testified on behalf of the defense. Dr. Johnson, by his own admission, couldn't say what would have happened in the cardiac workup that he thought should occur that would have led to a diagnosis of aortic dissection. Dr. Johnson admitted, and quite candidly conceded on cross-examination, that there was no obligation, the standard of care did not exist. It did not require Dr. Almeida to diagnose aortic dissection in the emergency room. It had to happen through a cardiac workup. Dr. Johnson, being an emergency room physician, wasn't willing to speculate what that cardiac workup would have been. He thought it would have led to it. But the one cardiologist who testified, that's Dr. Scherer, said that cardiac workup was not called for, and if it were, it wouldn't have gone in that direction in any event. I think that it's fairly clear from the record that Judge Elrod gave the plaintiff every opportunity to present the case. Great leeway in cross-examination. As I mentioned before, Dr. Almeida on the stand for an extraordinarily lengthy adverse examination. The jury heard the plaintiff's best shot. They evidently found the witnesses for the defense more credible and more convincing. And the judgment was a product of a fair trial, I think should be the conclusion I respectfully submit to this court. Thank you very much. Thank you. I'll try to take these points a little bit at a time if I could. As far as the issue about the admissions and submitting Dr. Almeida's testimony from the first trial, we submitted that testimony in its entirety to the court. This point about Dr. Almeida sitting there, the case law is clear. It doesn't have anything to do with whether the doctor is sitting there or not. You're entitled to introduce that evidence as an admission. This judge denied us from doing that. That was an incorrect decision that needs to be overturned on that. Did you make an offer of proof? We absolutely submitted the testimony from the first trial to this judge and asked that he allow us to read that testimony. Did you make an offer of proof? I believe that that was an offer of proof. I believe that was adequate. With respect to, again, the coworkers, their own defendant doctor, Almeida in this case, and Dr. Joe both testified they have no reason to disbelieve that the testimony of the coworkers. Once you get there, once you understand that the testimony of the coworkers cannot be disregarded by this jury, that means that Dr. Almeida failed to ask the questions about the time of onset because it would have elicited that history. We have a patient who by all reports is alert, oriented, and capable of giving his own history. And the notes, the testimony, the notes indicate, and the testimony is that he was asked about his symptoms at onset. And he didn't say what his coworkers said. Well, the medical records don't say that at all. The medical records say the opposite. The medical records say real-time only. The court has them in the record and they can check that out. Again, the only thing it said that was at the second trial for the third go-round or whatever, Dr. Almeida's naked assertion was completely unsupported. Our contention has been from day one. And you can look at the basic principles that we stated in the first trial. The basic principles that were set forth in this case were uncontradicted, that the duty of the doctor was to ask the patient. And he should have elicited this history from the patient, not from the coworkers, from this patient. That's what we've been saying from day one. So this point about that the doctor had to witness the events, no. All he had to do was ask. All he had to do was ask Mr. Hamilton. All he had to do was ask Michael. Excuse me, Mr. James. I'm sorry. When his notes say patient reports abdominal pain at 2.30, what is that other than asking about the pain at onset? He doesn't say that in his notes. It just says the time of onset is 2.30. He never asked a question about the severity of the pain at the time of onset, about the location of the pain at the time of onset. We know from the 9-1-1 record alone that he had chest pain. Did Dr. Almeida elicit that history? We know how severe it was. Did he elicit that history? We know that the character was stabbing. Did he elicit that history? We know that he was diaphoretic just from the EMS report. Forget any witness. These are all from records. He never elicited any of that history. The evidence here is one-sided and overwhelming. All he had to do was ask and ask Mr. Michael. Dr. Almeida admitted that Michael was intelligent. He answered his questions intelligently, honestly, and thoroughly. Michael told him, hey, I drank alcohol the night before. I have high blood pressure. He wanted this doctor, and Dr. Almeida admitted this, to have every piece of information about him possible so that he could save his life. If this doctor had asked Michael, Michael would have told him. Everybody said that. So that is uncontradicted, unrebutted in this case, that Michael was an honest and intelligent person who gave this doctor every information that the doctor asked for. We also have basic principle that it's Michael who's the patient. It's not his job to ask. He doesn't know what aortic dissection is or what the significance of the symptoms at one point in time is and another. The doctor knows that it's his job to ask. They admitted that. So this is just one-sided testimony in this case. If you're going back to a cross-examination, you specifically asked him about it, the pain, when it first began, correct, Dr. Almeida? Yes. Well, here, Thomas v. Liberkian. In that case, you had the defendant testify that he yielded to, this is a motor vehicle case, he yielded to the other car and that the other car was 500 feet away and all this other stuff. And the court said, yes, the defendant can get up there and say whatever he wants. But not if it's obviously conjecture and surmise based upon all the other evidence in the record. And that's what happened in that case. That's what happened in this case. It needs to be the same result. In that case, the court said, upon appeal, however, we are required to review cases not only as to the law, but also as to the facts. It's our duty to review the evidence and to reverse the judgment of the trial court whenever we find such judgment to be clearly against the manifest weight of the evidence. So a guy, a doctor in this case, a defendant doctor, can't just get up there and say, oh, yeah, I asked him all the questions, now that I know what your case is and that it revolves around that. Oh, yeah, 10 years ago we've been there. I don't remember this patient. I don't remember what I said to him. I don't remember my medical treatment of him. I didn't even know that he was at his place of work when this happened. We're not a jury. I'm sorry. But he didn't even know that he was at his place of work when this happened. Forgive my exuberance. He didn't even know that he was at his place of work when this happened, but he asked him about these questions and didn't elicit that he was at his workplace? I mean, that just defies all credulity, logic, and reason. This verb needs to be overturned. So with this 501 issue, and let's talk about, well, he's not unavailable because he had his evidence stepped. Look, the case law is clear. The case law doesn't say that where the other side fails to produce a witness that the, I don't know how to put it, let's say the defendant, like it is in this case, where the defendant fails to produce their witness that it's the plaintiff's burden to call that witness because they have the testimony available. It's not our expert. It's their expert. They retained him. And he's not available to us, and that is clear from the case law. You can read, as I'm sure you have, all the case law in this case that says we have a retained expert that's not available to the plaintiff. I can't call up, it would have been improper and unethical for me to call up Dr. Mulliken and say, hey, are you ready for trial? That would be completely inappropriate. Plus, they had represented to this court that he was unavailable. That was their representation to this court. So in terms of stuff about cumulative, we've always argued from the very outset that this testimony was not cumulative. In fact, it's diametrically opposed because the whole key to Mulliken's testimony was he said, I can't say, I don't know that there's sufficient evidence to be able to say that this section occurred after the ER. And he said that it probably occurred before the ER. So that's diametrically opposed to see shown. There's only one remedy for that, and that is the jury instruction 5.01 in this case. That's the only thing that can allow a remedy when the defendant fails to produce their own retained expert that they deliberately made an election, you heard it, chose not to call. They elected not to call him. Now you've got to live with the consequences. And so you have to live with the consequences that you could have read that testimony to the jury and decided not to. I don't agree with that. You couldn't have read it? The judge gave you permission to read it? I don't agree that we could have read it or that they would have addressed it. Did the judge say that you could? Did the judge say yes or no? We could have read it, yes. But I don't agree that that is a remedy in this case or that that would have allowed us to have the remedy that we're entitled to when it's their expert that they're not calling at this trial. The judge had already ruled it was duplicative. That may be his ruling, but it's incorrect. Well, you've got to show it's an abuse of discretion. When you have the one expert saying something that's entirely the opposite of the other expert on the key issue in this case, causation, that's pretty central to the case. Let me ask you something, Mr. Jasner. When you get a 501c instruction, a missing witness instruction, all you get is the instruction to the jury that there's a witness out there that's under the defendant's control, which, all other things being equal, it would be reasonable for them to call. Because they haven't called them and that witness is under the defendant's control, you may assume that that witness's testimony would be adverse to the defendant. That's the instruction, right? Correct. You don't then get to read the witness's testimony, the missing witness's testimony to the jury, right? Well... So what Judge Elrod did here was give you more than you ever could have gotten with a missing witness instruction. That is, read the testimony to the jury. No. What Judge Elrod gave to us here is that you can mention that there is some conflict between the one doctor and the other. He said that I'm specifically barring you, I'm prohibiting you from mentioning that there's any adverse inference in this case, that they failed to call anybody, that there's a missing witness or anything of the kind. And that's what we were entitled to, that's what the instruction gives, and that's what would have changed the outcome in this case. So I think it's clear that that would have been totally inadequate in this case. In terms of the stuff about Dr. Johnson, I just want to mention that briefly, this ridiculous notion that somehow he was their expert. Yes, if you mischaracterize and twist his testimony to the point that they did where his literature said that in 90 percent of the cases there's going to be an abnormality on the x-ray, which, by the way, Dr. Schuman testified to at length. But even given that, he never said that there's a 90 percent chance that this dissection occurred after the ER. He testified to the opposite of that, and this defendant told the jury something completely opposite of that, and that's not a fair comment on the evidence. That's an improper argument to the court, to the jury, and this court doesn't need to, we don't need to object to that. In my view, I think the court can look to the waiver law on that when you have such an improper argument to the jury. But to say that Dr. Johnson testified at length that this doctor violated every one of the basic principles 1 through 12, and that that caused this patient's death, that somehow that's their expert, I think is absurd. But I think that in summary, it's clear in this case that the testimony of the coworkers is uncontradicted, unrebutted. The paramedics, I'll just state this briefly, can look at the record evidence. Stacey Govia testifies that this starts at 1.45 p.m. The paramedics may have been called by telephone, but they don't arrive until 2.18 p.m., that's 33 minutes later. All of the stuff that was going on with Michael that she talked about was going on before the paramedics got there. The paramedics testified, they asked this patient about real-time only, not about what was going on before they got there. And every other person did, too. It doesn't contradict, in fact it corroborates what Ms. Govia said, because we weren't allowed to ask the question. The judge sustained an objection when we asked the paramedic, this was severe pain, wasn't it? And he was about to say yes. But it's clear that from all of the evidence that it was severe pain, and their own doctor defendant said so, as did their expert. Just going off the ER record alone, when you have a patient, 35 years old, found lying on the floor in pain at his place of work, that's severe pain. So that corroborates what Ms. Govia said. There's not one single corroborating piece of evidence for Dr. Elmaida's naked assertion that he did ask. Therefore, we ask that this Court grant a JNOV for us, and at the very least a new trial on that issue alone. You've got the issue as to the speculative testimony of Dr. Elmaida, not only that he did ask, but also of their expert doctor she's shown on the issues that we've discussed. Then you've got their improper closing argument, and also, very importantly, the 501. So we ask that the Court grant JNOV, at the very least, a new trial. Thank you.